Earl A. WATKINS, Jr., Respondent,

v.

MOTORS INSURANCE CORPORATION, Appellant.

No. 22086.

Kansas City Court of Appeals.

Missouri.

Oct. 4, 1954.

Vance Julian, Clinton, for appellant.

Delton L. Houtchens, Clinton, for respondent.

CAVE, Presiding Judge.

Plaintiff brought suit against defendant on an automobile fire insurance policy for damage sustained as the result of a fire occurring in and on the motor, body and wiring of plaintiff's automobile. The trial to a jury resulted in a verdict and judgment for plaintiff for $413.50, and defendant appealed.

It is admitted that the policy was in force; and that plaintiff's automobile sustained some damage as the result of a fire. The real controverted issue was the amount of the damage directly resulting from the fire. More than ten days before trial, defendant tendered plaintiff the sum of $75 for damages plus accrued costs, and deposited the same with the clerk of the court. The tender was rejected.

Plaintiff lived in Clinton, Missouri, and in September, 1952, purchased a new Buick automobile from a dealer in that city, and on May 30, 1953, in the early evening, drove to Windsor, a distance of about 20 miles. After visiting with some friends, he and some guests prepared to return to Clinton. He started the motor, after the third or fourth attempt, and heard a noise under the hood but paid no attention to it at the moment, until someone told him his car was on fire. He raised the hood and found a mass of flames covering the motor. With the aid of bystanders, the fire was soon extinguished. Without further examination of the car, plaintiff started the motor, which "ran as good as ever". He drove back to Clinton and parked for the night in front of his drug store. The next morning he went to his car and noticed "a puddle of something" on the ground beneath the motor and put his finger in this material and smelled it, and determined that it was not gasoline; he then drove to the golf course about a mile from Clinton and returned later. The following morning he started to drive to Warrensburg, and when two or three miles from Clinton he heard a noise in the motor, and for the first time noticed that the oil gauge registered "zero". He drove back to Clinton, where it was found that the motor was without oil, and he took it to the Buick dealer and reported the fire. In due time, an adjuster for the defendant came and examined the car and estimated the cost of repairs at $30, but plaintiff demanded a new motor, which was declined. Plaintiff took the car to the Detweiler Garage, where repairs were made. The total repair and parts bill was $121.87.

At this point, the parties disagree as to whether all the damage found by the mechanic was *directly due to the fire*, as provided by the policy, or whether some of the damage was due to the failure of the plaintiff to properly protect the automobile after the fire. The policy provides: "1. When loss occurs, the insured shall: (a) protect the automobile, whether or not the loss is covered by this policy, and any further loss due to the insured's failure to protect shall not be recoverable under this policy; resonable expenses incurred in affording such protection shall be deemed incurred at the company's request". The issue of whether plaintiff properly *protected* the car after the fire was submitted to the jury by defendant's instruction 3.

However, defendant contends that its instruction "B", offered at the close of all the evidence, should have been given. This instruction told the jury that its verdict must be for plaintiff for $75 damages and $47.50 court costs. The instruction was offered on the theory that, under the evidence, plaintiff's damage resulting *directly* from the fire was limited to certain repairs totaling $75. We will review the evidence concerning this issue.

Plaintiff's witness, Salmon, testified that he was present at the time of the fire; that when Watkins attempted to start the motor, "I heard a backfire in it, which was a pretty loud noise for a backfire. * * * I saw smoke coming out from underneath of it (hood) * * *. By the time I got up there they was holding the hood up * * *. The motor and the oil on the motor was on fire, and the insulation on the hood and there was quite a blaze. The oil all over on the motor was burning off of it." Some man came across the street with a fire extinguisher and assisted in putting out the flames, but the material in the fire extinguisher gave out and a "tote sack" was used to complete the extinguishment of the flames. He noticed "around the valve covering, there was a blaze coming out there, where you put in the oil. I just took the sack and smothered out what blaze there was coming out around there. * * *

"Q. Did you observe whether or not they were coming from down out of the pipe? A. Well, it was inside the valve tappet cover, where you pour the oil in, right on top of the Buick, and the tappet was right under that. The blaze was burning around that.

"Q. And the flame from under there was coming out the oil intake pipe? A. Just around where they pour the oil in, it doesn't fit tight, there is a gasket around it."

On cross examination, he was asked:

"Q. * * * What's the usual cause of a main bearing and a connecting rod bearing going out? A. Usually it is a lack of oil.

"Q. Lack of oil? A. That's about the only thing.

"Q. Could it possibly be damaged by fire, main bearing and—direct damage by fire? A. Direct damage, no."

After the fire was extinguished, Mr. Watkins stated that he would drive his car to Clinton, and requested Mr. Salmon to follow along behind him at a slow rate of speed, which he did.

Mr. Detweiler, the mechanic who made the repairs, testified that when the car was brought to his garage, he first cleaned the motor; "It had burned all over the motor, you could tell that from the oil and soot all over the whole side of the motor. * * * I found this car, the main bearings burned out of it, the connecting rod bearings gone, gasket on top of carburetor burned off, the gasket in between the carburetor and the top of the carburetor, a small gasket, burned out, the valve cover gasket gone. * * * I had to tear the motor down * * * and found the bearings, the main bearings and the connecting rod bearings, in bad shape on the shaft, so I had to replace them all * * * and told Mr. Watkins * * * to drive it three or four hundred miles and bring it back to me and I would tear it down again and check this journal, which I did, I put another new bearing on this journal so that he could go ahead and drive the car at a higher rate of speed. * * *

At that time I never noticed that the wiper motor was damaged from the fire, * * *." The car was driven for a few days and returned to the garage and the mechanic found the "hydraulic pressure hose from the pump—the power steering—busted, which I would say was slightly damaged from the fire * * * it blew out and I had to install it, which I think came to $14.76." The total cost of the parts and repairs was $121.87. This witness further testified that the damage to the bearings resulted from the "loss of oil"; that the loss of the oil was due to "a valve cover gasket being either burned out or blown out;" that the oil had been pumped out through that opening in the gasket.

All witnesses agree that the fire did not and could not reach the part of the motor housing the bearings, but that they were damaged by lack of oil.

■ Under the evidence, the jury could find that the "valve cover gasket" was damaged by the fire in such a manner that the oil was permitted to escape from the motor, resulting in the damage to the bearings. If so, the defendant would be liable therefor, unless the plaintiff failed to reasonably "protect" the car after the fire. We have reviewed the evidence on this issue and conclude it was a question for submission. We are not willing to hold, as a matter of law, that plaintiff could not submit such an issue.

The most difficult question is whether the evidence supports the amount of the verdict and judgment. So far as this case is concerned, the liability under the policy is fixed by the following provision: "The limit of the company's liability for loss shall not exceed the actual cash value of the automobile, or if the loss is of a part thereof, the actual cash value of such part, at time of loss, *nor what it would then cost to repair or replace * * * such part thereof with other of like kind and quality,* with deduction for depreciation. * * * The company may pay for the loss in money or may *repair* or *replace* the automobile or such part thereof, as aforesaid * * *."

(Italics ours.) Since neither the automobile nor the motor were destroyed the obligation of the defendant is limited to the repair and replacement of the parts damaged or destroyed, *with others of like kind and quality,* or pay for same in money. Plaintiff's damage instruction submitted that standard of liability.

■ Plaintiff employed Detweiler to make the repairs and replacements. There is no evidence that all damaged parts were not repaired or replaced, or that the parts replaced were not of *like kind and quality* of those damaged or destroyed. Detweiler did testify that the repairs and replacements he made would not put the automobile in as good condition as it was before the fire, and that this could be done only by installing a new motor, which would cost $550. His opinion is based on the fact that after a fire such as this one "it is reasonable to expect to find further difficulties" which are not discoverable at the time of making the repairs. However, this is entirely speculative in the instant case, and such possibilities cannot constitute an element of damage. There was no evidence of the difference in value, if any, of the car before the fire and after repairs had been made.

■ It must be kept in mind that this is a suit on an insurance contract and defendant's liability is fixed by the provisions of the contract. It is not the usual and ordinary suit for damages to property. Under the policy and the evidence, defendant was obligated to pay the cost of the repairs or replacement of any parts which were damaged or destroyed, with parts of like kind and quality; it was not required to install a new motor. As we have said, there is no evidence that the repaired or replaced parts were not of equal kind and quality of those damaged. Under the evidence, plaintiff was entitled to recover only $121.87.

Defendant also contends that the court erred in refusing its instruction "C". This instruction told the jury that plaintiff was

not entitled to recover for the repairs to the main and rod bearings. We have held that the evidence was sufficient to make a submissible issue on such items of repair. Consequently, the court did not err in refusing the instruction.

If plaintiff will, within fifteen days, enter a remittitur in this court in the sum of $291.63, the judgment will be affirmed for $121.87 as of the date of its entry in the lower court; otherwise, the judgment will be reversed and the cause remanded.

All concur.